## THURSTON McCORKLE v. THE STATE.

No. 22127.   Delivered June 3, 1942.
Rehearing Denied October 28, 1942.

The opinion states the case.

*H. J. Cureton,* of Meridian, and *Vernon Goodall,* of **Waco,** for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

The appellant was charged with the murder of his father, J. V. McCorkle, and given a penalty of five years in the penitentiary.

The facts in this case are rather peculiar, and it is vigorously insisted that, this being a case of circumstantial evidence, such are insufficient upon which to predicate a verdict of guilt.

Appellant was an unmarried man, about forty years of age, large and clumsy, and slow in his reactions. To some extent

he was addicted to drink, which was displeasing to his father. He lived on the home place with the father, a married sister, her husband and their two children, one three years old and one fifteen months of age. The home of the father was about four miles west of Valley Mills, on a public highway, and consisted of some 377 acres of land, farmed at such time by the son-in-law, Emil Olsen.

On the day of the tragedy, July 4, 1941, the father, a man about seventy-four years of age, had been to an old settlers' gathering, and arrived home before sundown. Appellant and the son-in-law had been to Waco, some forty miles away, in the afternoon, and returned home also before sundown. They had nine cows to milk, and appellant and Olsen went to the cow lot, across the road from the house, and concealed therefrom by a hill, and they proceeded to milk such cows, milking four each in about an hour, and Olsen left the ninth cow for appellant to milk. Olsen and the father ate their supper, and Olsen and wife and three-year-old boy then got in the car and left for Waco, leaving the fifteen months old baby asleep in its bed, in the room of and near to the bed of the father, where the baby usually slept. The deceased was left by them standing near the fireplace, alive and in his usual good health. This was just before dark, although the lights were turned on in the house, just before eight o'clock.

About 10 o'clock appellant appeared at the home of Mrs. Mildred Hanna, about half a mile from the Thurston home, and appellant told her that his father was dead; he appeared to be drinking. He asked her to call the undertaker. He told her that he had been out milking the cows and came in and set his milk on the cabinet, and went in the room and switched on the light, and his father was dead. He said his father's arm was lying off the bed and he picked it up, and he discovered he was dead. "Thurston told me that he came in from milking, put his milk up in the house somewhere and walked into the room where his father was and he said he went to put his arm up on the bed and discovered he was dead. He said he switched on the light in the room and it was after he switched on the light that he saw his father. He did not say anything about his father being beaten up. * * * I didn't have any trouble deducting when I first looked at him in there and saw the bruises on him that he had been killed."

Witness Lamp then got a car and took appellant back home from Mrs. Hanna's; they went into the father's room and turned on the light, and witness could tell that deceased had been hurt. The furniture was all in place; the deceased's clothing was placed as though he had undressed, his socks were in his shoes, in their proper place; very little blood in evidence on the bed, and the baby at the foot of the bed as though asleep. The dead body was uncovered; it had on long underwear, and a blue shirt too large for the body; the right arm across the body and the left arm by its side, palm up. When the undertaker arrived he immediately called the justice of the peace before touching the body of the deceased, it being apparent that he had died by violence. There was no blood on the underclothing or shirt, and very little on the mattress. Under the mattress was found the deceased's tobacco and purse, where he was in the habit of putting them when he went to sleep, and in his mouth were found his false teeth. When the undertaker saw the wounds he told appellant that an inquest would have to be held, and appellant said "he didn't know anything like that would have to be done; he saw no use of having an inquest."

The wounds were described by the undertaker as follows:

"I found he was badly bruised under the left eye; it was badly bruised and swollen to some extent. On this side of his face the lower half of his ear and all this part of his face down to his cheek bone was badly bruised up to about the edge of his hair. There was a very bad bruise in back of his left ear, and a very bad bruise to the right ear. I keep a record and if you do not mind I will refer to a record I have kept which will be enlightening to me. In the left temple just about on to the left temple there was a bruise as big as a nickel that was a terrible bruise. Above the right nipple here there was another such bruise, as if he had been jobbed with an instrument or something that size. It would be the size that would remind me it was made with some kind of an instrument. In the center of the breast directly underneath the chin was just such another bruise. Directly over the nipple, half way between the nipple and the jaw bone there was a sunken place that showed that it had been done after death in my opinion, it was the size of the heel of a boot about as big as a half dollar or a little bigger. There was a place that showed to have been some kind of an instrument or sharpened instrument about half way between the corner of the eye and the

temple; that I suppose was done with the same thing that the one in the breast was done with. And then right here was a bad bruise that covered practically all of the protruding bone behind the ear. And then as if a man would take another with his right hand in the throat like that I found finger marks. On the right side of the body there was three marks as if they were finger marks, and on the left side one as if it was a thumb mark; like if I had those three fingers and that thumb in the throat of a man. Then on his back I found about half way from the small of his back to his shoulder blades, close to the shoulder blade in the back were two places that were pressed in; in other words, it did not open the tissues but it did redden it, that I judge was done in life. On the back of the right hand was a very bad wound like that and the skin had been turned back on the right hand. On his right knee just outside of center, practically directly on the knee cap there was a deep skinned place, the skin had been removed it wasn't there. In other words it left an open scar or wound there; there was not sufficient skin left there, that was gone. I believe with the exception that there was a bad wound in his lip right under his lip, that practically went through to the teeth or to the bone of his upper jaw, right in there, that is all."

The doctor testified that from these wounds a quantity of blood was bound to have flowed, yet the undertaker testified that the body was clean; he did not have to wash it, and there was practically no blood in evidence, and the body was still warm. It was also testified by the justice of the peace, as well as others, that appellant had a black eye; "it was a whopper, his right eye." The doctor said that he saw this bruise on appellant's eye; it was a bruised place, and he saw no evidence of it having bled; it was a "hematoma," which is an oozing of the capillary blood underneath the skin; it oozes and caused a knot filled with blood."

Sheriff Montgomery then testified that he arrested appellant that night, and saw a spot on his shirt that he took to be blood, and placed him in jail; that the next morning the blood spot was not on the shirt; but he did find blood specks thereon; that he cleaned out the accumulation under appellant's finger nails and sent such cleanings, together with the shirt, to a State chemist at Austin. The chemist testified that he found traces of human skin and human blood in the finger nail

scrapings, and traces of human blood on the shirt as well as on appellant's overalls.

Mr. and Mrs. Olsen both testified and gave their whereabouts from 8 o'clock until they reached home about 2 o'clock on the night of the killing. Mrs. Olsen testified that the over large shirt on her father's dead body was not her father's; that such was a "Big Jess" shirt; both her father and the appellant owned such "Big Jess" shirts, her father's being size 15 and appellant's being size 17; that the one on her father's dead body was size 17, and her father's "Big Jess" shirts were all accounted for and were not on his body.

The appellant did not take the stand, and we have only his statement to others on the night in question in explanation of this crime. It was further shown by the witness Nowlin that some two months previous appellant had talked with the witness and had evidenced dissatisfaction with the father relative to the management of the property, and, upon being assured of his father's fairness, appellant said: "You don't know how mean the old son-of-a-bitch has been to me." Some two years prior thereto another witness, Jack Busby, testified that while appellant was in town and was drinking, and pretty full, the father told him to go home, and as the father walked off appellant said: "he was always butting into his business and that if he didn't keep his bill out of his business he was going to take an elm pole and maul hell out of him." This above statement, however, was denied by two persons whom the witness Busby said were present at such time, and verity thereof became a question for the jury. This witness also testified that he had heard appellant say: "That his daddy had money, but the old devil was too stingy to let him have it, he ought to die."

The State's case offers a motive: the presence of appellant and the deceased alone upon the premises; the unexplained interval of nearly two hours between the discovery of J. V. McCorkle's death and the presence of appellant at Mrs. Hanna's home about one-half mile away; the presence of blood and human skin under appellant's finger nails; the blood specks upon the shirt, the blood upon appellant's overalls, the blood spot on the shirt evidently washed out by appellant in jail; the bruise on the face of appellant called a hematoma by the doctor, which means a skin sac containing blood; the further fact of the washed and cleaned body of the deceased laid out

and composed in his bed, with clean clothing thereon, the shirt doubtless being one of appellant's own shirts; the removal of all blood stains, and the failure of appellant to make mention of any signs of violence upon this bruised and battered body when reporting the death of his father,—these circumstances should have and doubtless did remove from the minds of the jury any other reasonable hypothesis than that of appellant's guilt.

True it is, astute counsel offered before this court, and surely in the trial court, defenses, but we fail to find proof thereof in the record,—such as the skin found beneath the finger nails could have come from scratching chigoes, such insects being prevalent at that time of the year, yet we find no proof of such; the blood under such nails could have come from the appellant's head injury, yet a hematoma does not exude blood; the blood specks on the shirt and overalls could have also come from the bruised eye, but same was still a hematoma, not exuding blood. The failure to observe and report the death by violence could have been caused by appellant's slow reflexes, and his mental actions not being active and quick, and the bruised eye could have been caused by a fall on account of the clumsiness of appellant, and while the slow mental processes or clumsiness are evidenced in the testimony, nowhere therein is it shown that he had received such a fall, nor is the bruised eye explained except in the proffered theory alone.

All these defenses are found in the record and were offered to the jury, but they evidently found them to be but theories only and not substantiated by any proof at hand.

Mrs. Olsen, the deceased's daughter, and her husband and two small children were the only persons besides appellant and the deceased who lived at this home. According to their testimony they left the home place just before dark, about 8 o'clock, and had turned on the lights at the home, the appellant and deceased being left there. Mrs. Olsen attended the moving picture show at Waco, and Mr. Olsen visited around with numerous friends and acquaintances, and gave the name and location of each person he talked to for any length of time, and his movements were easily traceable, had such tracing been deemed necessary.

Evidently there was a struggle before Mr. McCorkle's life was taken, and the undisturbed condition of his room gave rise to the assumption that such struggle took place out of the house, otherwise not only some signs thereof would have been in the room, but surely some blood would have come from the numerous wounds and injuries on the battered body.

A stranger would not have known where the deceased's room was, nor where his bed was located, nor where his underclothes could be found, nor furnished the oversize shirt in which the body was clothed, nor would such stranger have been so kindly disposed as to wash the body of the deceased, after the fury of his anger had spent itself, and then compose the same in the article of death, leaving the impression that it was but sleep.

There was no motive of robbery, nothing was taken, the pocketbook and tobacco being in their accustomed place. The false teeth, usually taken from the mouth at nighttime, were found, however, in the deceased's mouth, which latter circumstances, taken together with the bruise on appellant's face, as well as the lack of blood on the bed and in the room, was evidently taken by the jury to show that the deceased was awake and had not gone to bed at the time of his death.

No set of facts can possibly exclude every hypothesis; they are not expected to; but they can exclude every other *reasonable* hypothesis, and we think these facts do exclude every other reasonable hypothesis than that of appellant's guilt as a patricide. The jury saw the witnesses, they heard their testimony, they heard the appellant's plea, they observed his demeanor, and heard his explanation given to others as to finding this body, and they also evidently heard the persuasive argument of distinguished counsel, performing his duty toward his client; they rejected all theories relative to the strongly incriminating circumstances that enmeshed appellant, and rendered their verdict of guilt, which evidently satisfied their consciences, and we do not think we would be justified in setting that verdict aside.

It is urged that because one grand jury failed to indict appellant, and because of the low penalty awarded by this trial jury, that such evidenced the uncertainty created in their minds as to the full cogency of these facts to show guilt beyond

a reasonable doubt. Such may be true, however there may have been other reasons, and we have no right to speculate upon matters or reasons not found in the record. We can only reason from that which is furnished us therein.

The bills of exceptions found in the record are in question and answer form, and not accompanied by a proper certificate of the trial court that such form was necessary, and therefore such bills should not be considered by us.

Being of the opinion that the testimony here presented was sufficient upon which to predicate a verdict of guilt by the jury, the judgment is affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant insists that we should not have refused to consider his bill of exception number seven, although it was in question and answer form, because the complaint was directed at the form of the question which could only be shown by setting out the language in which the question was couched. The authorities support appellant's position. Young v. State, 92 Tex. Cr. R. 277, 243 S. W. 472; Bowers v. State, 138 Tex. Cr. R. 98, 134 S. W. (2d) 675. Bill number seven shows that the witness Busby was asked by the prosecuting officer the following question: "In the last year or two have you ever heard this defendant, Thurston McCorkle, say anything with respect to his father or curse his father when he refused to give him money or anything like that?" Objection was made on the ground, among others, that the question was leading. The bill shows only that the witness answered "Yes." We doubt if the question was so hurtfully leading as to present any serious matter. When the statement of facts is looked to it is discovered that the witness related an incident which occurred some two years before the homicide while appellant was drinking and deceased told him he had better go home, and that after deceased walked away appellant said: " * * * he was always butting into his business and that if he didn't keep his bill out of his business he was going to take an elm pole and maul hell out of him." On redirect examination the witness testified that on another occasion he heard appellant say: " * * *that his Daddy had money, but the old devil was too stingy to let him have it, he ought to die."

If there was error in the form of the question,—which is not admitted—the record fails to reveal any such error as would call for a reversal.

Appellant also insists that his bill of exception number two should be considered, although in question and answer form. We can see no necessity for this bill to be in such form.

We have considered bill of exception number three. When taken in connection with the trial court's explanation it appears to present no error.

The facts were closely scrutinized upon original submission. A further statement of them would be only useless repetition. We remain of the opinion that we would be unauthorized to say that the jury was without evidence to support their verdict.

The motion for rehearing is overruled.